[Cite as *Carpenter v. Antero Resources Appalachian Corp.*, 2022-Ohio-4619.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

DANFORD CARPENTER ET AL.,

Plaintiffs-Appellants,

v.

ANTERO RESOURCES APPALACHIAN CORPORATION ET AL.,

Defendants-Appellees/ Cross-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 MO 0007**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2017-297

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. George A. Barton,* Barton and Burrows, LLC, 5201 Johnson Drive, Suite 110, Mission, Kansas 66205, and *Atty. Beau W. Cross,* Cross Law Office, LLC, 417 Main Street, Caldwell, Ohio 43724, for Plaintiffs-Appellants

*Atty. Gregory D. Russell, Atty. Peter A. Lusenhop,* and *Atty. Ilya Batikov,* Vorys, Sater, Seymour and Pease LLP, 52 East Gay Street, P.O. Box 1008, Columbus, Ohio 43216, for Defendant-Appellee/ Cross Appellant Antero Resources Appalachian Corporation

*Atty. Daniel P. Corcoran, Atty. Kristopher O. Justice,* and *Atty. Adam J. Schwendeman,* Theisen Brock, 424 Second Street, Marietta, Ohio 45750, for Defendant-Appellee/ Cross Appellants Danny Offenberger et al.

Dated:  December 15, 2022

**D'APOLITO, J.**

{¶1}  Appellants, Danford ("D.K.") and Patsy Carpenter, (husband and wife), as Trustees of the Danford and Patsy Carpenter Revocable Living Trust ("the Carpenters"), appeal from six judgments of the Monroe County Court of Common Pleas, including summary judgment rulings entered in favor of Appellees, Antero Resources Appalachian Corp., et al. (individual defendants and "Antero"): (1) September 16, 2021 Judgment Entry (Incorporating Findings of Fact and Conclusions of Law – granting Antero's request for prejudgment interest ($92,079.41) and attorney's fees ($313,950.98); (2) June 7, 2021 Second Nunc Pro Tunc Amendment to July 10, 2020 Judgment Entry (Incorporating Findings of Fact and Conclusions of Law); (3) May 4, 2021 Nunc Pro Tunc Judgment Entry (Incorporating Findings of Fact and Conclusions of Law); (4) April 19, 2021 Judgment Entry (Incorporating Findings of Fact and Conclusions of Law); (5) August 20, 2020 Nunc Pro Tunc Amendment to July 10, 2020 Judgment Entry (Incorporating Findings of Fact and Conclusions of Law); and (6) July 10, 2020 Judgment Entry (Incorporating Findings of Fact and Conclusions of Law).

{¶2}  On appeal, the Carpenters assert the trial court erred: (1) in finding they breached their warranty of title to Antero under the 2013 Lease and in awarding damages and attorney's fees to Antero; (2) in granting 42 individual defendants' motion for summary judgment as to their ownership of a portion of the minerals in the 22.75 acre portion of Property A and in finding that such mineral interests were not extinguished under the Marketable Title Act ("MTA"); (3) in granting 31 individual defendants' motion for summary judgment as to their ownership of a portion of the minerals in Property C and in finding that such mineral interests were not extinguished under the MTA; and (4) in finding that they failed to exercise reasonable diligence to locate the holders of mineral interests in the 198.75 acre tract prior to publishing their notices of abandonment under the Ohio Dormant Minerals Act ("DMA").  In its cross-assignment of error, Appellees Danny Offenberger, et al. (collectively the "Offenberger Group"), allege the trial court erred: (1) in denying their motion for leave to amend their counterclaim to assert an additional claim arising under the MTA; and (2) in denying their motion concerning title

Case No. 21 MO 0007

with respect to Property B under the MTA. In its conditional cross-assignment of error, Antero asserts to the extent that the trial court erred in denying the Offenberger Group's motions for summary judgment concerning title with respect to Property B and Property D under the MTA, then the court also erred in failing to award additional damages on Antero's breach of warranty claim against the Carpenters. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

{¶3}    The Carpenters own the surface of a 198.75 acre farm in Seneca Township, Monroe County, Ohio (the "Property"). Five tracts comprise the Property: Property A, a 40 acre portion and a 22.75 acre portion[1]; Property B, a 40 acre tract; Property C, a 73.25 acre tract[2]; and Property D, a 22.75 acre tract. Each tract is subject to reservations and exceptions of oil and gas mineral and royalty rights made in the early 1900s (the "Mineral Reservations"). The Mineral Reservations were made by Vincent G. Carpenter and other members of the Carpenter family, including Theodore P. Carpenter (D.K. Carpenter's grandfather).

{¶4}    In 2010, the Carpenters hired Attorney Cliff Sickler to assist them with abandoning the Mineral Reservations through the DMA. Through Attorney Sickler, the Carpenters published four notices of abandonment in the *Monroe County Beacon* as to the 40 acre portion of Property A, Property B, Property C, and Property D and they recorded four affidavits of abandonment. The Carpenters did not attempt to abandon the Mineral Reservations under the 22.75 acre portion of Property A and their notice on Property D did not refer to the Mineral Reservations at issue. The Carpenters directed their published notices of abandonment to the original reserving parties, Vincent G. Carpenter, et al. The Carpenters did not try to serve the holders of the mineral interest

---

[1] These portions of Property A were subject to two mineral reservations recorded in Deed Book 71 in the Monroe County Recorder of Deeds dated in April 1908. In November 1952, the portions of Property A were conveyed to D.K. Carpenter.

[2] The deed which severed the minerals from the surface of Property C was the quit claim deed recorded in April 1908. The interest in Property C was conveyed to the Carpenters through a Warranty Deed recorded in January 1963 in Deed Book 142.

Case No. 21 MO 0007

by certified mail before publishing their abandonment notices nor did they name any of the present-day holders.

{¶5} Because the heirs of Vincent G. Carpenter, et al. were also members of the Carpenter family, the Carpenters personally knew many of them. One of the mineral holder defendants, Jeffrey Stevens, celebrated Thanksgiving with the Carpenters. Another, Gene West, a.k.a. V'non West, helped the Carpenters with farm work. Appellant D.K. Carpenter attended school with defendant Shelba Wills. Appellant Patsy Carpenter owned a "green book" that had a lot of information in it about the Carpenter family. Notwithstanding these facts, the Carpenters' notices of abandonment identified no present holders of the Mineral Reservations.

{¶6} Three years after their attempted DMA abandonment, the Carpenters hired Attorney Sickler to represent them in negotiating an oil and gas lease with Antero for their Property. The parties, the Carpenters (as Lessors) and Antero (as Lessee) signed an oil and gas lease on June 12, 2013 (the "Lease"). The Lease grants to Antero all of the oil and gas under the 198.75 acre Property within certain geological formations.

{¶7} Specifically, Paragraph 1, "Grant of Lease," provides that the Carpenters conveyed to Antero "all of the oil, gas, liquid and gaseous hydrocarbons" in formations "below the base of the Ohio Shale formation" under the "Leased Premises[;]" "explicitly reserve[s]" to the Carpenters "all lands from the surface to the base of the Ohio Shale Formation[;]" and also states that "Lessee expressly agrees not to drill any well on the surface of the lands described herein." (6/12/2013 Lease, Paragraph 1).

{¶8} Paragraph 2, "Description of the Land included in this Lease," defines the "Leased Premises," as being the entire Property, i.e., Properties A, B, C, and D, totaling 198.75 acres. (*Id.*, Paragraph 2). Additionally, Paragraph 7(D) states that Antero "may withhold royalties without obligation to pay interest in the event of a bona fide dispute or good faith question of royalty entitlement (either as to ownership or as to amount)."

{¶9} Paragraph 21, "Warranty of Title," states:

> Lessor hereby warrants and agrees to defend the title to the lands and interest described in Paragraph 1, but if the interest of Lessor covered by this lease is expressly stated to be less than the entire fee or mineral estate, Lessor's warranty shall be limited to the interest so stated. Lessor further

warrants that the lands hereby leased are not subject to any valid prior oil and gas leases. Lessee may purchase or lease the rights of any party claiming any interest in said land and exercise such rights as may be obtained thereby and Lessee shall not suffer any forfeiture nor incur any liability to Lessor by reason thereof. Lessee shall have the right at any time to pay for Lessor, any mortgage, taxes or other lien on said lands, in the event of default of payment by Lessor, and then be subrogated to the rights of the holder thereof. Any such payments made by Lessee for Lessor may be deducted from any amounts of money which may become due Lessor under this lease.

(*Id.*, Paragraph 21).

**{¶10}** Believing that it had leased all of the oil and gas under the Leased Premises, Antero paid the Carpenters a bonus payment of $1,788,750.00 for signing the Lease, based on $9,000 per acre for each of the total 198.75 acres of oil and gas rights in the Properties. Antero included the Properties in two oil and gas development units, the McDougal Unit and the D.K. Carpenter Unit, and drilled in all five horizontal wells (the "Units"). The Units began producing oil and gas in 2014 and Antero began paying the Carpenters all of the royalties attributable to the 198.75 acres included in the Lease. Before receiving any royalties, the Carpenters signed Division Orders for the Units certifying the ownership of their decimal interests in production or proceeds payable to Antero. The decimal interests reflected the Carpenters as owning 100 percent of the oil and gas in the leased 198.75 acres.

**{¶11}** In September 2016, the Supreme Court of Ohio issued its decision in *Corban v. Chesapeake Exploration, L.L.C.*, 149 Ohio St.3d 512, 2016-Ohio-5796, holding that the 1989 version of the DMA was not self-executing and that efforts to abandon dormant mineral rights after June 30, 2006 had to proceed under the 2006 DMA. In the fall of 2016, Antero suspended royalties due under the Lease while it studied the title to the Properties to understand the extent of the Carpenters' ownership. In April 2017, Antero recalculated the Carpenters' decimal interests. Antero then resumed paying the Carpenters going back to the September 2016 accounting period and forward based on

their reduced decimal interests. Antero placed the remaining royalties into suspense and later into an escrow account pursuant to an order by the trial court.

{¶12} On October 3, 2017, the Carpenters filed a complaint against Antero and over 150 individual defendants who had potential mineral interests in the Property alleging three counts: count one, quiet title and declaratory judgment, asserting that the Carpenters owned all the oil and gas rights under the Property through their abandonment proceeding under the DMA; count two, alleging that Antero breached its oil and gas Lease with the Carpenters by withholding royalties; and count three, also directed against Antero, asserting claims for declaratory judgment, restitution, imposition of a constructive trust, and a demand for equitable accounting relating to royalties the Carpenters claimed were owed to them under the Lease.

{¶13} On November 30, 2017, Antero filed an answer and counterclaim alleging three counts: count one, declaratory judgment relating to the Carpenters' entitlement to royalties and other lease payments attributable to the disputed mineral interests; count two, breach of warranty of title in the oil and gas Lease; and count three, interpleader under Civ.R. 22 for royalties that it placed in suspense pending a resolution of their title dispute.

{¶14} Other individual defendants filed answers and asserted counterclaims that the Carpenters had failed to obtain a valid abandonment of the individual defendants' mineral interests under the DMA. The Offenberger Group, Donna M. Keaton et al. (the "Keaton Group"), Raymond Long, Monica M. Howell, and Amanda Carpenter filed answers to the Carpenters' complaint. These parties, except Amanda Carpenter, also asserted counterclaims for declaratory judgment and quiet title against the Carpenters and Antero over their ownership, and cross-claims against Antero for trespass, conversion, permanent injunction, and accounting arising from Antero's production of oil and gas from the Carpenters' Property without permission from the defendants.

{¶15} The Carpenters acquired the interests of certain named defendants and dismissed them from the litigation. The Carpenters also moved for default judgment against certain non-answering defendants which the trial court granted. At this point, the

remaining parties were the Carpenters, Antero, the Offenberger Group, the Keaton Group, Raymond Long, Monica M. Howell, and Amanda Carpenter.[3]

**{¶16}** On July 12, 2018, the Offenberger Group moved for joinder of additional parties to the lawsuit which included the heirs, successors, and assigns of Fred O. Sulsberger who had a record interest in a royalty reservation pertaining to one of the subject properties, Property B.  Following briefing, the trial court entered an agreed joinder order on May 28, 2019 requiring the complaint to be served on certain identified individuals (the "Sulsberger Group") as potential successors-in-interest of Fred O. Sulsberger.  The Sulsberger Group filed an answer to the Carpenters' complaint and asserted a counterclaim against the Carpenters and a cross-claim against the Mineral Owner Defendants and Antero for declaratory judgment and quiet title.

**{¶17}** On June 3, 2019, the parties entered into a stipulation regarding the ownership for each of the five tracts at issue in this case "'without regard to any abandonment or extinguishment under the [DMA] or the [MTA], not accounting for any default or consent judgment entries being filed in this case, and not accounting for any leasehold interest that is owned or that may be owned by [Antero].'"  *See* (7/10/2020 Judgment Entry, p. 5).

**{¶18}** The Offenberger Group filed a motion for summary judgment.  The Carpenters filed a cross-motion for summary judgment.

**{¶19}** On July 10, 2020, the trial court determined that the Carpenters only own 112.73 net mineral acres in the 198.75 acre Leased Premises.  The court held that the Carpenters failed to successfully use the DMA to abandon the subject mineral interests. The court found that the Carpenters missed at least 23 separate filings in the Monroe County records showing the transfer of the disputed minerals.  The court held that the Carpenters failed to perform a reasonably diligent search for holders under R.C. 5301.56(E)(1) and did not include proper names and addresses of current holders in their published abandonment notice under R.C. 5301.56(F)(1).  Regarding the MTA, the court denied summary judgment to the Offenberger Group because the claimants lacked eligible roots of title.

---

[3] The Offenberger Group, the Keaton Group, Raymond Long, Monica M. Howell, and Amanda Carpenter are (collectively the "Mineral Owner Defendants").

**{¶20}** Regarding the 22.75 acre portion of Property A, the trial court noted that based on the Notices of Abandonment and the Affidavits of Abandonment, it is undisputed that the Carpenters did not initiate a DMA abandonment with respect to any prior mineral interest. The court found:

> Although the 22.75 acre portion of Property A was made subject to an oil and gas exception in the 1908 deed recorded at Deed Volume 71, Page 571, [the Carpenters] did not serve a notice under division (E)(1) or file an affidavit under division (E)(2) of the DMA. Thus, the oil and gas rights with respect to the 22.75 acres of Property A have not been abandoned and vested in [the Carpenters] under the DMA.

(7/10/2020 Judgment Entry, p. 6).

**{¶21}** Regarding Property D, the trial court held:

> It is also undisputed that [the Carpenters] did not initiate a DMA abandonment for Property D with respect to the 1908 oil and gas exception in Deed Volume 71, Page 571. [The Carpenters'] division (E)(1) notice and division (E)(2) affidavit for Property D did not refer to this deed or to any of the parties to the deed. Thus, the oil and gas rights excepted in Deed Volume 71, Page 571 for Property D have not been abandoned and vested in [the Carpenters] under the DMA.

(*Id.*)

**{¶22}** The trial court also denied the Carpenters' cross-motion for summary judgment as untimely. The court found, on the merits, that the Carpenters failed to state a valid MTA claim due to references in their chain of title to the disputed oil and gas interests as well as muniments that constituted title transactions that preserved the disputed minerals under R.C. 5301.49(D). The court further found that periods of constructive possession by certain record holders preserved those holders' interests in accordance with R.C. 5301.49(B).

Case No. 21 MO 0007

{¶23} Accordingly, the trial court dismissed the Carpenters' quiet title and declaratory judgment claims; granted judgment to the Offenberger Group on their declaratory judgment claim that the Carpenters failed to serve a proper notice of abandonment as required by R.C. 5301.56(E); and granted judgment to the Offenberger Group regarding their quiet title claim in the proportions set out in the order. The court modified the July 10, 2020 judgment through nunc pro tunc entries filed on August 20, 2020 and June 7, 2021.

{¶24} Antero filed a motion for summary judgment against the Carpenters on the parties' competing claims over their rights and obligations under their oil and gas Lease. The Carpenters opposed the motion arguing that under Paragraph 21 of the Lease, they only warranted title to the mineral ownership which the trial court ultimately indicated they owned. On April 19, 2021 and May 4, 2021 (Nunc Pro Tunc), the trial court found in favor of Antero. The court noted that the Carpenters' Lease conveyed "all of the oil, gas, liquid and gaseous hydrocarbons" under the Properties and that the Lease further allowed Antero to "withhold royalties without obligation to pay interest in the event of a bona fide dispute or good faith question of royalty entitlement (either as to ownership or as to amount)." (5/4/2021 Nunc Pro Tunc Judgment Entry, p. 7). The court reiterated its findings that the Carpenters owned only 112.73 acres out of the 198.75 comprising the Properties or just over 56 percent of the fee rights with the Mineral Owner Defendants owning the remainder. Accordingly, the court found Antero did not breach the Carpenters' Lease when it suspended the disputed portion of the Carpenters' royalties.

{¶25} The trial court found for Antero on its breach of warranty counterclaim. The court noted that the Carpenters "warranted title to 'the lands and interests described in Paragraph 1,' being all of the oil and gas under the Properties[.]" (*Id.* at p. 9). The court also found that Antero was constructively evicted from the Lease as to the portion of the Property that the Carpenters did not in fact own according to the July 10, 2020 Judgment Entry. The court found that Antero overpaid the Carpenters by $2,478,233.95 between bonus and royalties. Having resolved the parties' lease obligations and the disposition of royalties, the court held that the Carpenters' claims for declaratory judgment, restitution, equitable accounting, and constructive trust were moot.

{¶26} Following a hearing, on September 16, 2021, the trial court awarded Antero's request for prejudgment interest ($92,079.41) and attorney's fees ($313,950.98). By the time the court entered this judgment, all other claims between all the other parties had been either dismissed or decided.

{¶27} The Carpenters filed this appeal and raise four assignments of error. The Offenberger Group filed a cross-appeal and raise two cross-assignments of error. Antero conditionally cross-appealed and raises a single, conditional cross-assignment of error.

## SUMMARY JUDGMENT STANDARD OF REVIEW

An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is 'material' depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

'(T)he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim.' (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293, 662 N.E.2d

264. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Brewer v. Cleveland Bd. of Edn.*, 122 Ohio App.3d 378, 386, 701 N.E.2d 1023 (8th Dist.1997).

The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327, 364 N.E.2d 267.

*Doe v. Skaggs*, 7th Dist. Belmont No. 18 BE 0005, 2018-Ohio-5402, ¶ 10-12.

## DORMANT MINERAL INTERESTS

At common law, mineral rights severed from the surface estate were not subject to abandonment or termination for the failure to produce oil or gas or to extract other minerals. 1A Summers, *The Law of Oil and Gas*, Section 8.4, at 139 (3d Ed.2004). Abandonment of an interest in real property required proof of the owner's intent to abandon it, and it therefore could not be presumed from mere nonuse. *Gill v. Fletcher*, 74 Ohio St. 295, 305, 78 N.E. 433 (1906); *Kiser v. Logan Cty. Bd. of Commrs.*, 85 Ohio St. 129, 131, 97 N.E. 52 (1911); *W. Park Shopping Ctr., Inc. v. Masheter*, 6 Ohio St.2d 142, 144, 216 N.E.2d 761 (1966); *Beer v. Griffith*, 61 Ohio St.2d 119, 121, 399 N.E.2d 1227 (1980).

Over time, mineral rights were fractionalized through devise, descent, and conveyance, and parties seeking to develop a mineral interest often had difficulty identifying and locating its owners. *See generally Dodd v. Croskey*, 143 Ohio St.3d 293, 2015-Ohio-2362, 37 N.E.3d 147, ¶ 7; *Van Slooten v. Larsen*, 410 Mich. 21, 45-46, 299 N.W.2d 704 (1980); 1A Summers, *The Law of Oil and Gas*, Section 8.4, at 139-140.

Case No. 21 MO 0007

*Corban, supra*, at ¶ 15-16.

## THE MARKETABLE TITLE ACT

The General Assembly enacted the Marketable Title Act, R.C. 5301.47 et seq., in 1961, Am.H.B. No. 81, 129 Ohio Laws 1040, to extinguish interests and claims in land that existed prior to the root of title, with "the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record chain of title." R.C. 5301.55. This legislation provides that marketable record title—an unbroken chain of title to an interest in land for 40 years or more, R.C. 5301.48—"shall be held by its owner and shall be taken by any person dealing with the land free and clear of all interests, claims, or charges whatsoever, the existence of which depends upon any act, transaction, event, or omission that occurred prior to the effective date of the root of title." R.C. 5301.50. Marketable record title therefore "operates to extinguish" all other prior interests, R.C. 5301.47(A), which "are hereby declared to be null and void," R.C. 5301.50.

When initially enacted, the Marketable Title Act did not "bar or extinguish any right, title, estate, or interest in and to minerals, and any mining or other rights appurtenant thereto or exercisable in connection therewith." Former R.C. 5301.53(E), 129 Ohio Laws at 1046. However, the General Assembly amended former R.C. 5301.53 and former R.C. 5301.56 in 1973 "to enable property owners to clear their titles of disused mineral interests." Am.S.B. No. 267, 135 Ohio Laws, Part I, 942-943. Thus, the Marketable Title Act extinguished oil and gas rights by operation of law after 40 years from the effective date of the root of title unless a saving event preserving the interest appeared in the record chain of title—i.e., the interest was specifically identified in the muniments of title in a subsequent title transaction, the holder recorded a notice claiming the interest, or the interest "(arose) out of a title transaction which has been recorded subsequent to the effective date of the root of title." R.C. 5301.48 and 5301.49.

*Corban*, *supra*, at ¶ 17-18.

## THE 1989 DORMANT MINERAL ACT

The General Assembly again amended the Marketable Title Act in 1989 when it enacted the Dormant Mineral Act, Sub.S.B. No. 223, 142 Ohio Laws, Part I, 981, 985-988 ("S.B. 223"), "to provide a method for the termination of dormant mineral interests and the vesting of their title in surface owners, in the absence of certain occurrences within the preceding 20 years." 142 Ohio Laws, Part I, at 981.

The 1989 law, codified in former R.C. 5301.56, stated: "Any mineral interest held by any person, other than the owner of the surface of the lands subject to the interest, shall be deemed abandoned and vested in the owner of the surface," unless (a) the mineral interest was related to coal, (b) the interest was held by the United States, the state of Ohio, or another political body described in the statute, or (c) one or more of the following saving events had occurred within the preceding 20 years:

(i) The mineral interest has been the subject of a title transaction that has been filed or recorded in the office of the county recorder of the county in which the lands are located;

(ii) There has been actual production or withdrawal of minerals by the holder from the lands, from lands covered by a lease to which the mineral interest is subject, or, in the case of oil or gas, from lands pooled, unitized, or included in unit operations, under sections 1509.26 to 1509.28 of the Revised Code, in which the mineral interest is participating, provided that the instrument or order creating or providing for the pooling or unitization of oil or gas interests has been filed or recorded in the office of the county recorder of the county in which the lands that are subject to the pooling or unitization are located;

(iii) The mineral interest has been used in underground gas storage operations by the holder;

(iv) A drilling or mining permit has been issued to the holder, provided that an affidavit that states the name of the permit holder, the permit number, the type of permit, and a legal description of the lands affected by the permit has been filed or recorded, in accordance with section 5301.252 of the Revised Code, in the office of the county recorder of the county in which the lands are located;

(v) A claim to preserve the interest has been filed in accordance with division (C) of this section;

(vi) In the case of a separated mineral interest, a separately listed tax parcel number has been created for the mineral interest in the county auditor's tax list and the county treasurer's duplicate tax list in the county in which the lands are located.

Former R.C. 5301.56(B)(1), S.B. 223, 142 Ohio Laws, Part I, at 985, 986-987.

Notably, in contrast to R.C. 5301.47(A) and 5301.50 of the Marketable Title Act, the 1989 law did not use the word "extinguish," nor did it declare dormant mineral interests "null and void." Rather, it provided that dormant mineral interests "shall be deemed abandoned and vested in the owner of the surface." The word 'deem' means "(t)o treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have." *Black's Law Dictionary* 504 (10th Ed.2014).

In enacting the 1989 law, the General Assembly created a conclusive presumption by establishing that a mineral rights holder had abandoned a severed mineral interest if the 20 year statutory period passed without a saving event. The statute remedied the difficulties faced by a surface owner seeking to quiet title to a dormant mineral interest, an action that requires

proof that the mineral rights holder—who may not be locatable or identifiable from land records—had abandoned and relinquished that interest. At common law, such an action would have failed absent proof of the property owner's subjective intent. *See Beer*, 61 Ohio St.2d at 121, 399 N.E.2d 1227. Thus, by providing a conclusive presumption that the mineral interest had been abandoned in favor of the surface owner if the holder failed to take timely action to preserve it, the legislature provided an effective method of terminating abandoned mineral rights through a quiet title action.

*Corban, supra*, at ¶ 19-21, 25.

## THE 2006 AMENDMENT TO THE DORMANT MINERAL ACT

The 2006 amendment to R.C. 5301.56(B) provides that a dormant mineral interest "shall be deemed abandoned and vested in the owner of the surface of the lands subject to the interest if the requirements established in division (E) of this section are satisfied." 2006 Sub.H.B. No. 288 ("H.B. 288").

R.C. 5301.56(E) directs the surface holder to give advance notice to the mineral rights holder, allowing it an opportunity to preserve its mineral rights from being deemed abandoned and merged with the surface estate. R.C. 5301.56(E), (F), and (G). If neither a claim to preserve the interest nor an affidavit proving that a saving event occurred within the preceding 20 years is timely recorded, then the surface holder may record a notice that the mineral interest has been abandoned, and "the mineral interest shall vest in the owner of the surface of the lands formerly subject to the interest, and the record of the mineral interest shall cease to be notice to the public of the existence of the mineral interest or of any rights under it." R.C. 5301.56(H). This statute therefore operates to establish the surface owner's marketable record title in the mineral estate.

*Corban, supra*, at ¶ 29-30.

Case No. 21 MO 0007

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN FINDING THAT THE APPELLANTS BREACHED THEIR WARRANTY OF TITLE TO APPELLEE ANTERO RESOURCES APPALACHIAN CORP. ("ANTERO") IN PARAGRAPH 21 OF THE 2013 LEASE, AND IN AWARDING DAMAGES AND ATTORNEYS' FEES TO ANTERO ON THAT CLAIM.**

**{¶28}** In their first assignment of error, the Carpenters argue the trial court erred in granting summary judgment to Antero on its breach of warranty claim and that the entire award of damages and attorneys' fees must be reversed. The Carpenters stress that they did not breach their warranty of title under Paragraph 21 of the 2013 Lease. The Carpenters claim the contractual language reflects they did not warrant that they held title to all of the minerals which they leased to Antero.

**{¶29}** As stated, this court will review a trial court's decision to grant summary judgment de novo. *Doe, supra,* at ¶ 10-12. However, an abuse of discretion standard applies to a trial court's award of attorney's fees. *Spires v. Oxford Mining Co., LLC,* 7th Dist. Belmont No. 17 BE 0002, 2018-Ohio-2769, ¶ 45.

> An abuse of discretion is more than mere error of law or judgment; rather, it involves an unreasonable, arbitrary, or unconscionable decision. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). It is for the trial court to ascertain whether the rate per hour and the number of hours expended were reasonable and to work up or down from that number using various factors as the court sees fit. *Bittner*[*v. Tri-County Toyota, Inc.*], 58 Ohio St.3d 143, 569 N.E.2d 464 [(1991)]. "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere." *Id.* at 146, 569 N.E.2d 464.

*Spires* at ¶ 45.

> Oil and gas leases are contracts, and therefore, "'(t)he rights and remedies of the parties to an oil or gas lease must be determined by the terms of the written instrument.'" *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d

524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 9, quoting *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897). "It is a well-known and established principle of contract interpretation that '(c)ontracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'" *Lutz* at ¶ 9, quoting *Skivolocki v. E. Ohio Gas Co.*, 38 Ohio St.2d 244, 313 N.E.2d 374 (1974), paragraph one of the syllabus.

The burden of proof with respect to an oil and gas lease case is not controlled by substantive oil and gas law, but, rather, by civil procedure. *Pfalzgraf v. Miley*, 7th Dist. Monroe, 2018-Ohio-2828, 116 N.E.3d 893, ¶ 32, *reconsideration denied*, 7th Dist. Monroe No. 16 MO 0005, 2018-Ohio-3595, 2018 WL 4265449, *and appeal not allowed*, 154 Ohio St.3d 1443, 2018-Ohio-4962, 113 N.E.3d 552 (2018). The party who asserts a claim in an oil and gas case carries the burden of proof, just as in any other civil case. *Id.* at ¶ 45.

*Christman v. Condevco, Inc.*, 7th Dist. Monroe No. 19 MO 0008, 2020-Ohio-938, ¶ 16.

**{¶30}** Again, Paragraph 1, "Grant of Lease," provides that the Carpenters conveyed to Antero "all of the oil, gas, liquid and gaseous hydrocarbons" in formations "below the base of the Ohio Shale formation" under the "Leased Premises[.]" (6/12/2013 Lease, Paragraph 1).

**{¶31}** Paragraph 2, "Description of the Land included in this Lease," defines the "Leased Premises," as being the entire Property, i.e., Properties A, B, C, and D, totaling 198.75 acres. (*Id.*, Paragraph 2).

**{¶32}** Paragraph 21, "Warranty of Title," states:

Lessor hereby warrants and agrees to defend the title to the lands and interest described in Paragraph 1, but if the interest of Lessor covered by this lease is expressly stated to be less than the entire fee or mineral estate, Lessor's warranty shall be limited to the interest so stated. Lessor further warrants that the lands hereby leased are not subject to any valid prior oil and gas leases. Lessee may purchase or lease the rights of any party

claiming any interest in said land and exercise such rights as may be obtained thereby and Lessee shall not suffer any forfeiture nor incur any liability to Lessor by reason thereof. Lessee shall have the right at any time to pay for Lessor, any mortgage, taxes or other lien on said lands, in the event of default of payment by Lessor, and then be subrogated to the rights of the holder thereof. Any such payments made by Lessee for Lessor may be deducted from any amounts of money which may become due Lessor under this lease.

(*Id.* at Paragraph 21).

**{¶33}** The Carpenters could have limited the Lease's description of the Leased Premises to something less than all the oil and gas. They did not. The Carpenters could have also refused bonus and royalty payments on the interests that they did not own. They did not.

**{¶34}** The foregoing lease language establishes that the Carpenters leased all the oil and gas in certain depths to all 198.75 acres of their Property to Antero and also warranted that oil and gas through Paragraph 21. The purpose of the warranty clause is to protect Antero against defects in the Carpenters' title. The Carpenters breached that warranty when the trial court held that the Carpenters only owned, and thus could only lease to Antero, just over one-half of the mineral rights in the 198.75 acres. "'In interpreting a contract, a court must give effect to the words used, not insert new words.'" *Fendley v. Wright State Univ.*, 10th Dist. Franklin No. 18AP-113, 2019-Ohio-1963, ¶ 17, quoting *Cleveland Elec. Illuminating Co. v. Cleveland*, 37 Ohio St.3d 50, 53, 524 N.E.2d 441 (1988).

**{¶35}** A warranty of title "'is an undertaking by the warrantor that on the failure of the title which the deed purports to convey, either for the whole estate, or for a part only, by the setting up of a superior title, that he will make compensation in money for the loss sustained by such failure.'" *People's Sav. Bank Co. v. Parisette*, 68 Ohio St. 450, 458, 67 N.E. 896, 897 (1903), quoting *King v. Kerr's Adm'rs,* 5 Ohio 154, 155 (1831); *see also Bd. of Edn. Toronto City Schools v. American Energy Utica, LLC,* 7th Dist. 18 JE 0025, 2020-Ohio-586, ¶ 43. A "warranty clause," in turn, is:

1. A contractual clause containing a warranty. 2. Oil & gas. A provision in an oil-and-gas lease by which the lessor guarantees that title is without defect and agrees to defend it. If the warranty is breached, the lessor may be held liable to the lessee to the extent that the lessor has received payments under the lease.

Black's Law Dictionary, (11th Ed.2019).

{¶36} Here, the Carpenters agreed not only to defend the title, but also warranted that title and, therefore, agreed to make compensation in money for the loss sustained by the title's failure. The Carpenters' failure to clear their title led to a judgment for the Mineral Owner defendants. That judgment constructively evicted the Carpenters, and Antero as their lessee, from the portions of the oil and gas that the Carpenters did not own. A grantor breaches a warranty of title when there is an actual or constructive eviction of the warrantee. *See King, supra,* at 155.

{¶37} The Lease's proportionate reduction language contained in Paragraphs 9 and 30 are coextensive with the warranty clause in Paragraph 21. The language permitted Antero, upon discovering that the Carpenters may not own all the oil and gas that they leased, to pay the Carpenters royalties on what Antero understood the Carpenters actually owned without breaching its obligations under the royalty clause. Antero did just that and placed the remaining royalties into a suspense account and later into escrow with the court.

{¶38} The trial court awarded Antero monetary damages for the Carpenters' breach of their warranty of title consisting of overpayments Antero made to the Carpenters in view of their actual ownership in the Property and attorney's fees. The Carpenters only challenge the court's award of attorney's fees. The Carpenters claim that nothing in the warranty clause expressly permits recovering attorney's fees and that the Lease does not expressly mention the shifting of attorney's fees. However, the Carpenters contracted for a warranty clause which includes attorney's fees as a component of damages upon breach. *See Schmiehausen v. Zimmerman*, 6th Dist. Ottawa No. OT-04-042, 2005-Ohio-3363, ¶ 7 ("One well defined and long established exception is that when there is a proper award of exemplary or punitive damages, reasonable counsel fees may be awarded."

(Citations omitted). "Another equally well established exception, however, is that a grantee of a deed with general warranty covenants may be entitled to recover the costs, including attorney fees, expended in defense of the title conveyed with such covenants.")

{¶39} Thus, a warrantee may recover attorney's fees expended in litigation with third parties to defend the warranted title. This is true when, as in this case, the warrantee incurs attorney's fees in litigation with others as a result of the warrantor's breach. *See Hollon v. Abner*, 1st Dist. Hamilton No. C960182, 1997 WL 602968, *4 (Aug. 29, 1997) ("'where the wrongful act of the defendant has involved the plaintiff in litigation with others or placed him in such relation with others as makes it necessary to incur expense to protect his interest, such costs and expenses, including attorneys' fees, should be treated as the legal consequences of the original wrongful act and may be recovered as damages.'") The Carpenters have failed to show that the trial court's decision to award attorney's fees to Antero was an abuse of discretion.

{¶40} The Carpenters' first assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING FORTY-TWO INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THEIR OWNERSHIP OF A PORTION OF THE MINERALS IN THE 22.75 ACRE PORTION OF PROPERTY A, AND IN FINDING THAT SUCH MINERAL INTERESTS WERE NOT EXTINGUISHED AS OF NOVEMBER 20, 1992 UNDER THE MARKETABLE TITLE ACT ("MTA").**

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN GRANTING THIRTY-ONE INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THEIR OWNERSHIP OF A PORTION OF THE MINERALS IN PROPERTY C, AND IN FINDING THAT SUCH MINERAL INTERESTS WERE NOT EXTINGUISHED AS OF JANUARY 15, 2003 UNDER THE MTA.**

**{¶41}** In their second assignment of error, the Carpenters contend the trial court erred in determining that 42 of the individual defendants own mineral interests in the 22.75 acre tract of Property A which were not extinguished under the MTA as of November 20, 1992. The Carpenters stress that because the 1952 deed contains no reference to any prior mineral reservation in the 22.75 acre portion of Property A, the R.C. 5301.49(A) exception does not apply to preserve any individual defendants' mineral interest in the 22.75 acre portion of Property A from extinguishment under the MTA. The Carpenters further stress that because the trial court erred in applying the R.C. 5301.49(A) exception to preserve the mineral interests of the 79 individual defendants in the 22.75 acre portion of Property A, the court further erred in finding the Carpenters only owned 60.99636243 percent of the mineral interests in the 22.75 acre portion of Property A, (i.e., they claim they instead own 82.23148146 percent).

**{¶42}** In their third assignment of error, the Carpenters allege the trial court erred in ruling that 31 of the individual defendants own mineral interests in Property C which were not extinguished under the MTA as of January 15, 2003. Specifically, the Carpenters maintain the trial court erred in finding that the 1963 deed contained references to certain oil and gas reservations which were sufficient to trigger the application of R.C. 5301.49(A) and to preserve the individual defendants' mineral ownership in Property C from extinguishment under the MTA. The Carpenters further maintain that because the trial court erred in applying the R.C. 5301.49(A) exception to preserve the mineral interests of the 68 individual defendants in Property C, the court additionally erred in finding the Carpenters only owned 67.68287037 percent of the mineral interests in Property C, (i.e., they claim they instead owned 82.23148118 percent).

**{¶43}** Because the Carpenters' second and third assignments of error are interrelated, as they both allege the trial court erred regarding the MTA, we will address them together.

**{¶44}** Preliminarily, this court stresses that the Carpenters did not assert a claim under the MTA in their complaint. The Carpenters also never asked the trial court for leave to amend their complaint in order to assert such a claim. Rather, the Carpenters attempted to assert an entirely new claim arising under the MTA for the first time in an

untimely motion (their cross-motion for summary judgment) which was filed more than two and one-half years after their complaint was filed. The Offenberger Group repeatedly objected to the assertion of this new MTA claim. Because the MTA claim was not properly pled or timely asserted, it should not have been considered by the trial court.

**{¶45}** "'A new claim cannot be asserted by motion but must be asserted by amended complaint.'" *Hartline v. Atkinson*, 7th Dist. Monroe No. 20 MO 0006, 2020-Ohio-5606, ¶ 41, quoting *Wright v. Sears, Roebuck & Co.*, 10th Dist. Franklin No. 83AP-153, 1983 WL 3640, *2 (Aug. 9, 1983). Because the Carpenters never filed an amended complaint regarding their MTA claim, the trial court should not have ruled on it. *Id.* Accordingly, this court will not address the Carpenters' MTA arguments as they were not properly raised in the trial court. *Id.* at ¶ 42.

**{¶46}** In any event, the trial court did not err in denying the Carpenters' untimely cross-motion for summary judgment. Specifically, considering the merits, the court determined:

> Plaintiffs filed an untimely cross Motion for Summary Judgment concerning title on April 30, 2020. In their Motion, Plaintiffs asserted for the first time that they have marketable title to the oil and gas underlying the 22.75 acre portion of Property A, Property C, and Property D.

> Plaintiffs' Motion is denied. This Court finds that there are references in Plaintiffs' Root of Title for the 22.75 acre portion of Property A, Property C, and Property D, and in the subsequent muniments, to certain prior oil and gas interests and reservations. Since these references made Plaintiffs aware of the existence of the prior oil and gas reservations affecting the property, these interests are inherent in Plaintiffs' record chain of title and are therefore preserved under R.C. 5301.49(A).

> There are also additional exceptions that would preserve Defendants' interests in the oil and gas, including a number of filed or recorded title transactions by which the oil and gas interests would have been conveyed and out of which the oil and gas interests would have arisen. The Seventh

District has held that an instrument may affect an interest in land, and may save an interest from being extinguished under the MTA, even if the instrument does not identify or describe the interest or the land affected thereby. See *Warner v. Palmer*, 7th Dist. Belmont No. 18BE0012, 2019-Ohio-4078, ¶ 25.

The sixth, seventh, eighth, tenth, eleventh, twelfth, thirteenth, fifteenth, seventeenth, nineteenth, twentieth, twenty-first, and twenty-second title transactions listed above are within the chain of title * * *. So, even if Plaintiffs had marketable title to one or more properties in this case, the interests in the chain of title for these persons would be preserved under R.C. 5301.49(D) based on each title transaction that is recorded subsequent to Plaintiffs' Root of Title.

* * *

In this case, there are periods of possession by certain record holders * * *. Under R.C. 5301.49(B), these periods of possession preserve the oil and gas interests held by such persons who were in possession at the time when marketability was being determined for each property. * * *

Based on all of the foregoing, * * * Plaintiffs' Cross Motion for Summary Judgment is denied.

(7/10/2020 Judgment Entry, p. 15-17).

**{¶47}** The MTA has not extinguished the Offenberger Group's rights in the oil and gas underlying the 22.75 acre portion of Property A and Property C. The Mineral Interests are preserved by title transactions under R.C. 5301.49(D).[4] A title transaction involving

---

[4] R.C. 5301.49 states, "Such record marketable title shall be subject to:" "(D) Any interest arising out of a title transaction which has been recorded subsequent to the effective date of the root of title from which the unbroken chain of title or record is started; provided that such recording shall not revive or give validity to any interest which has been extinguished prior to the time of the recording by the operation of section 5301.50 of the Revised Code[.]"

Case No. 21 MO 0007

the interest of one mineral holder preserves the entire mineral interest for all holders. *See Hartline, supra.* Alternatively, the reference to an oil and gas reservation in the Carpenters' root of title preserves the oil and gas for the 22.75 acre portion of Property A and Property C under R.C. 5301.49(A).[5]

**{¶48}** The Carpenters' second and third assignments of error are without merit.

## ASSIGNMENT OF ERROR NO. 4

**THE TRIAL COURT ERRED BY FINDING, AS A MATTER OF LAW, THAT THE APPELLANTS FAILED TO EXERCISE REASONABLE DILIGENCE TO LOCATE THE HOLDERS OF MINERAL INTERESTS IN THE 198.75 ACRE TRACT PRIOR TO PUBLISHING THEIR NOTICES OF ABANDONMENT UNDER THE OHIO DORMANT MINERALS ACT ("DMA"), AND THAT APPELLANTS' ATTEMPTED DMA ABANDONMENT WAS THEREFORE INVALID.**

**{¶49}** In their fourth assignment of error, the Carpenters allege the trial court erred in granting summary judgment to the individual defendants on their claim that the individual defendants' mineral interests in the 40 acre portion of Property A, and in Properties B and C, were not abandoned pursuant to the DMA.[6] The Carpenters also contend the trial court erred in holding that they did not conduct a reasonably diligent

---

[5] R.C. 5301.49 states, "Such record marketable title shall be subject to:" "(A) All interests and defects which are inherent in the muniments of which such chain of record title is formed; provided that a general reference in such muniments, or any of them, to easements, use restrictions, or other interests created prior to the root of title shall not be sufficient to preserve them, unless specific identification be made therein of a recorded title transaction which creates such easement, use restriction, or other interest; and provided that possibilities of reverter, and rights of entry or powers of termination for breach of condition subsequent, which interests are inherent in the muniments of which such chain of record title is formed and which have existed for forty years or more, shall be preserved and kept effective only in the manner provided in section 5301.51 of the Revised Code[.]"

[6] The Carpenters do not contest the trial court's findings that they did not initiate a DMA abandonment with respect to any individual defendants' mineral interest in the 22.75 acre portion of Property A or with respect to any individual defendants' mineral interest in Property D. (1/20/2022 Appellants' Brief, p. 28). The Carpenters also do not challenge the Savings Events of four individual defendants (Shelba Wills, Richard Johnson, Yvonna Nicholes, and Wanda McBurney) and the trial court's mineral interest allocations for Property D. (*Id.* at p. 29-30).

search for the holders of the mineral interests in those properties before publishing their four Notices of Abandonment on September 23, 2010.

**{¶50}** The Carpenters take issue with the trial court's July 10, 2020 judgment, stressing: (1) the court did not determine that there was no genuine issue as to any material fact as to the Carpenters' alleged failure to exercise reasonable diligence in 2010 to locate the current holders of the mineral interests at issue; (2) the court did not expressly determine that the individual defendants were entitled to judgment as a matter of law on their claim that the Carpenters' attempted abandonment of the individual defendants' mineral interests in the properties at issue was invalid; and (3) the court did not make any findings that it appeared from the evidence that reasonable minds can come to but one conclusion and viewing the evidence most favorably to the Carpenters that conclusion is adverse to the Carpenters.

**{¶51}** Moreover, the Carpenters assert the trial court's ruling was further erroneous because it did not consider the evidence on the "reasonable diligence" issue in the light most favorable to the Carpenters. The Carpenters allege that Attorney Sickler complied with Supreme Court of Ohio precedent and did review the publicly available property and court records in Monroe County in an effort to identify the current holders of the mineral interests in the 198.75 acre tract but was unable to locate the names and addresses of such persons. *See Gerrity v. Chervenak*, 162 Ohio St.3d 694, 2020-Ohio-6705:

> Review of publicly available property and court records in the county where the land subject to a severed mineral interest is located will generally establish a baseline of reasonable diligence in identifying the holder or holders of the severed mineral interest. There may, however, be circumstances in which the surface owner's independent knowledge or information revealed by the surface owner's review of the property and court records would require the surface owner, in the exercise of reasonable diligence, to continue looking elsewhere to identify or locate a holder. But whether that additional search is required will depend on the circumstance of each case[.]

*Id.* at ¶ 36.

**{¶52}** The DMA statutory abandonment procedure essentially consists of the following: (1) service of notice under R.C. 5301.56(E)(1); (2) recording an affidavit under R.C. 5301.56(E)(2); and (3) memorializing the abandonment in the record under R.C. 5301.56(H)(2).

**{¶53}** The Carpenters' arguments on appeal are completely different from the arguments they made to the trial court with respect to their DMA claim. The Carpenters' arguments below centered on the fact that the Supreme Court of Ohio's decision in *Corban* should be overruled and that the standard for a diligent search in 2010 differed from the standard that is applied today (an argument that this court has since rejected). The Carpenters' arguments have apparently been abandoned and replaced by a new argument in this appeal, i.e., that there are genuine issues of material fact as to whether they exercised reasonable diligence in their 2009-2010 search for the current holders of the mineral interests. We stress, however, that the Carpenters are not entitled to raise new arguments for the first time on appeal. The Carpenters never identified any specific factual disputes for the trial court relating to their reasonable diligence.

> "It is well-settled that an appellant cannot present new arguments for the first time on appeal. *Havely v. Franklin Cty. Ohio,* 10th Dist. No. 07AP–1077, 2008–Ohio–4889, fn. 3, quoting *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections* (1992), 65 Ohio St.3d 175, 177, 602 N.E.2d 622; see also *Republic Steel Corp. v. Bd. of Revision of Cuyahoga Cty.* (1963), 175 Ohio St. 179, 192 N.E.2d 47, syllabus; *Miller v. Wikel Mfg. Co ., Inc.* (1989), 46 Ohio St.3d 76, 78, 545 N.E.2d 76. Indeed, appellate courts typically will not consider arguments that were never presented to the trial court whose judgment is sought to be reversed. See *State ex rel. Quarto Mining Co. v. Foreman* (1997), 79 Ohio St.3d 78, 81, 679 N.E.2d 706, quoting *Goldberg v. Indus. Comm.* (1936), 131 Ohio St. 399, 404, 3 N.E.2d 364.

*J.P. Morgan Chase Bank v. Macejko*, 7th Dist. Mahoning Nos. 07-MA-148 and 08-MA-242, 2010-Ohio-3152, ¶ 36.

**{¶54}** In any event, the record reveals that the Carpenters failed to exercise reasonable diligence prior to publishing a notice of intent to abandon under division (E)(1). The law is clear that when a surface owner fails to exercise reasonable diligence prior to publishing a notice of intent to abandon under division (E)(1), a DMA abandonment claim must fail. *See, e.g., Miller v. Mellott*, 7th Dist. Monroe No. 18 MO 0004, 2019-Ohio-504; *Fonzi v. Miller*, 7th Dist. Monroe No. 19 MO 0011, 2020-Ohio-3739; *Fonzi v. Brown*, 7th Dist. Monroe No. 19 MO 0012, 2020-Ohio-3631; *Beckett v. Rosza*, 7th Dist. Jefferson No. 21 JE 0003, 2021-Ohio-4298; *Fonzi v. Miller*, Slip Opinion No. 2022-Ohio-901.

**{¶55}** For the properties on which the Carpenters did attempt a DMA abandonment, prior to service of the division (E)(1) notices, the mineral interests for all the properties were subject to Savings Events under division (B)(3)(a). The Carpenters do not contest this issue in this appeal. Prior to service of the division (E)(1) notices, the Carpenters did not perform a diligent search because they failed to serve the division (E)(1) notices by certified mail on persons they actually knew to be holders of the mineral interests and they either missed or ignored at least 19 separate filings in the Recorder's Office and in the probate court which showed that the mineral interests had been transferred.[7]

**{¶56}** The Carpenters' fourth assignment of error is without merit.

### CROSS-ASSIGNMENT OF ERROR NO. 1

### THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANTS' MOTION FOR LEAVE TO AMEND THEIR COUNTERCLAIM TO ASSERT AN ADDITIONAL CLAIM ARISING UNDER MTA.

---

[7] It is undisputed that at the time the Carpenters initiated their DMA abandonment, they knew that many of the defendants were family members and that they were the descendants of the original, record mineral holders of the Mineral Reservations. The Carpenters' extensive knowledge of and familiarity with defendants' names and addresses shows they could have served the division (E)(1) notices via certified mail instead of just publishing them in the newspaper. Many of the defendants in this case stressed that, had they received a notice by certified mail, they would have filed a claim to preserve and they did not intend to abandon their interests. The Carpenters' failure to continue their search for the mineral holders based on the names, addresses, and other information that was publicly available in Monroe County was per se unreasonable.

**{¶57}** In their first cross-assignment of error, the Offenberger Group asserts the trial court abused its discretion in denying their motion for leave to amend their counterclaim to assert an additional claim under the MTA. The Offenberger Group claims that in the 28 days allowed for the filing of an answer under Civ.R. 12(A)(1), they did not have time to conduct a full search of all the documents in the chain of title relating to the five separate tracts of land. The Offenberger Group stresses that allowing them to assert an additional claim under the MTA in October 2018 would not have resulted in any undue delay or prejudice.

**{¶58}** A trial court's decision regarding whether to amend a complaint is reviewed under an abuse of discretion standard. *Netherlands Ins. Co. v. BSHM Architects, Inc.,* 7th Dist. Monroe No. 18 MO 0001, 2018-Ohio-3736, ¶ 52. An abuse of discretion is more than mere error of law or judgment; rather, it involves an unreasonable, arbitrary, or unconscionable decision. *Blakemore, supra,* at 219.

**{¶59}** The Carpenters' memorandum in opposition to the Offenberger Group's motion for leave to amend aptly sets forth the following:

> On the surface, the request to file an amendment appears innocuous: Shelba Wills wants to amend her answer. However, Mr. Corcoran [attorney for Defendants] is asking for something far more burdensome, untimely, and unfairly prejudicial to the Plaintiffs.
>
> Restated: On October 8, 2018 (a full year after the Complaint was filed), Attorney Corcoran prepared a deed that conveyed an interest from *one defendant's property* to the several dozen *other defendants* that had previously not answered the complaint and for whom *this Court refused to grant leave to file untimely answers. * * ** The stated purpose of this maneuver is to avoid the effect of this Court's prior rulings. *It says so in the deed itself*:
>
> McGrath, and their heirs and assigns ("Grantees"), all of the right, title, and interest that each of the Grantees would have in the Property, but for the enactment and operation of the Marketable Title Act and Dormant Mineral

Act, R.C. 5301.47-5301.56, and but for the court's refusal to grant certain Grantees leave to file a responsive pleading in that certain action ("Litigation") styled *Carpenter v. Antero Resources Appalachian Corp., et al.,* Case No. 2017-297.

The undersigned has never encountered a deed that states "'but for the court's refusal to grant certain Grantees leave to file a responsive pleading'" within its text. This deed is a sham.

Moreover, it is a sham for the purpose of tricking this Court into granting leave to file untimely answers, which this Court has twice refused to do. As benignly explained by Mr. Corcoran, "'As a result, all of the moving parties have marketable record title to Property B…through Shelba Wills, as a result of the 2018 deed. Put differently, "'You refused to allow us to file an answer. Now through a deed that we have manufactured to create a "marketable title" issue, we want you to allow us (dozens of us) to file new counterclaims to litigate a "marketable title" issue in this case, and this is because we're not allowed to file an untimely answer.'"

This case is *not* in its early stages. Granting this motion *would cause* undue delay. It will also cause mountains of additional work for this Court. By design, Mr. Corcoran is essentially asking this Court to re-start the pleadings by allowing this one-year-delayed "'marketable title'" claim (manufactured by his October 8, 2018 sham deed) to be litigated anew. (Emphasis sic).

(10/25/2018 Plaintiffs' Memorandum In Opposition To Defendants' Motion For Leave To Amend And Second Motion For Reconsideration, p. 2-3).

**{¶60}** Antero joined the Carpenters by filing a memorandum in opposition to the Offenberger Group's motion for leave to amend by stating the following:

Antero joins Plaintiffs in opposing * * * Defendants' Motion for Leave to Amend * * *. This case lumbers into its second year. Had Defendant Shelba

Wills desired to assert a new marketable title act claim, she already had ample time to do so. She did not, and the Court should not permit her to assert that claim now, nor to transfer that claim to "'all the other defendants represented by her attorneys at Theisen Brock.'"

Defendants also try to evade the Court's prior rulings by causing Ms. Wills to deed a portion of her alleged, *contested* mineral interest to Ralph Lumbatis and others whom this Court *refused* to grant leave to file untimely answers. As the adage goes, "'(w)e should not permit parties to do through the back door what they cannot do through the front door.'" *Harris v. Cincinnati*, 79 Ohio App.3d 163, 173, 607 N.E.2d 15 (1st Dist.1992). For the reasons stated above and in Plaintiffs' opposition, the Court should deny Defendants' motions in their entirety. (Emphasis sic).

(10/30/2018 Antero's Memorandum In Opposition To Defendants' Motion For Leave To Amend And Second Motion For Reconsideration, p. 1-2).

{¶61} Based on the facts presented and given our standard of review, the trial court's decision denying the Offenberger Group's motion for leave to amend their counterclaim to assert an additional claim arising under the MTA did not amount to an abuse of discretion.

{¶62} The Offenberger Group's first cross-assignment of error is without merit.

## CROSS-ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANTS' MOTION CONCERNING TITLE WITH RESPECT TO PROPERTY B UNDER THE MTA.**

{¶63} In their second cross-assignment of error, the Offenberger Group contends the trial court erred in denying their motion concerning title with respect to Property B under the MTA.

{¶64} The individual defendants contend that the following title transactions constituted valid roots of title under the MTA for individual defendant Shelba Wills: (1) a

Case No. 21 MO 0007

May 25, 1955 Affidavit of Transfer and Record of Real Estate Inherited from Vincent Carpenter to Nora Johnson, Denver Carpenter, and Preston Carpenter; (2) a July 17, 1956 Certificate of Transfer from Preston Carpenter to Nora Johnson and Denver Carpenter; (3) a March 10, 1967 Certificate of Transfer from Denver Carpenter to Pauline Carpenter and Helen Weisend; (4) a March 10, 1967 Affidavit for Transfer and Record of Real Estate Inherited from Nora Johnson to Leland Johnson and Ellis Johnson; and (5) an April 14, 1967 deed from Pauline Carpenter and Helen Weisend to Leland Johnson and Ellis Johnson. The individual defendants argue that each of the foregoing title transactions conveyed the entirety of Property B from one party to another and, therefore, such title transactions account for the same interest to which Shelba Wills claims marketable title. However, this is incorrect.

**{¶65}** To meet the statutory definition of "root of title," a title transaction must satisfy two elements: (1) it must be a title transaction that is at least 40 years preceding the date when marketability is being determined; and (2) the title transaction must "create the interest claimed by such person." *Senterra Ltd. v. Winland*, 7th Dist. Belmont No. 18 BE 0051, 2019-Ohio-5458, ¶ 53, affirmed by the Supreme Court of Ohio, *Senterra, Ltd. v. Winland*, Slip Opinion No. 2022-Ohio-2521; R.C. 5301.47(E).

**{¶66}** In dealing with this issue, the trial court held the following:

Next, Defendants argue in their "'Motion for Summary Judgment Concerning Title to Property B with Respect to the Marketable Title Act'" that Defendant Shelba Wills, per operation of the MTA, is entitled to 87.5% of the oil and gas interest underlying Property B. * * *

* * *

According to *Senterra*, the first step is to determine "'Root of Title,'" which is at least 40 years preceding the date when marketability is being determined. * * *

In applying only the first step, Defendants [sic] Shelba Wills' MTA argument fails. The "'Root of Title'" must "'account for the interest the person is claiming to have record marketable title.'" Shelba Wills is claiming to have

an interest in 87.5% of the oil and gas, and so she must have a "'Root of Title'" that is at least 40 years old to account for this interest.

The only deed that the Defendants identify that grants any interest to Shelba Wills is a deed recorded on March 19, 2007. This is not an unbroken chain of title for 40 years. The Defendants' MTA claim for Property B fails, and this Court denies Defendants' Motion for Summary Judgment Concerning Title to Property B with Respect to the MTA.

(7/10/2020 Judgment Entry, p. 12-13).

**{¶67}** A review of the title transactions identified by the individual defendants do not create an interest in the entirety of the mineral estate as the record reveals, and this court determines, they either constitute/create fractionalized estates and/or do not meet the definition of a root of title under R.C. 5301.47(E). Thus, the individual defendants' motion for summary judgment under the MTA with respect to Property B failed as a matter of law because none of the title transactions prior to 2007 constituted a legitimate root of title deed under R.C. 5301.47(E).

**{¶68}** The Offenberger Group's second cross-assignment of error is without merit.

## CONDITIONAL CROSS-ASSIGNMENT OF ERROR

**TO THE EXTENT THAT THE TRIAL COURT ERRED IN DENYING APPELLEES-CROSS-APPELLANTS' DANNY OFFENBERGER ET AL., MOTIONS FOR SUMMARY JUDGMENT CONCERNING TITLE WITH RESPECT TO PROPERTY B AND PROPERTY D UNDER THE OHIO MARKETABLE TITLE ACT, THEN THE TRIAL COURT ALSO ERRED IN FAILING TO AWARD ADDITIONAL DAMAGES ON ANTERO RESOURCES CORPORATION'S BREACH OF WARRANTY CLAIM AGAINST APPELLANTS.**

**{¶69}** In its conditional cross-assignment of error, Antero argues that if the Offenberger Group prevails and is correct that the Carpenters own even less of the oil

and gas in the Properties than that determined below, then Antero is entitled to additional damages on its breach of warranty claim against the Carpenters.

{¶70} Due to this court's disposition of the Offenberger Group's two cross-assignments of error, we find Antero's conditional cross-assignment of error moot. *See Warner v. Palmer*, 7th Dist. Belmont No. 18 BE 0012, 2019-Ohio-4078, ¶ 28, citing *Pinkney v. Southwick Investments, L.L.C.,* 8th Dist. Cuyahoga No. 85074, 2005-Ohio-4167, ¶ 51; App.R. 12(A)(1)(c).

## CONCLUSION

{¶71} For the foregoing reasons, the Carpenters' assignments of error and the Offenberger Group's cross-assignments of error are not well-taken, and Antero's conditional cross-assignment of error is moot. The September 16, 2021, June 7, 2021, May 4, 2021, April 19, 2021, August 20, 2020, and July 10, 2020 judgments of the Monroe County Court of Common Pleas are affirmed.

Donofrio, P.J., concurs.

Robb, J., concurs.

Case No. 21 MO 0007

———————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgments of the Court of Common Pleas of Monroe County, Ohio, are affirmed. Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**